## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| THE COLLEGE DEMOCRATS AT THE UNIVERSITY OF MICHIGAN, THE COLLEGE DEMOCRATS AT MICHIGAN STATE UNIVERSITY, AND THE MICHIGAN FEDERATION OF COLLEGE DEMOCRATS,<br><br>Plaintiffs,<br><br>v.<br><br>RUTH JOHNSON, in her official capacity as the Michigan Secretary of State, and SALLY WILLIAMS, in her official capacity as the Director of the Michigan Bureau of Elections,<br><br>Defendant. | Case No. |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, THE COLLEGE DEMOCRATS AT THE UNIVERSITY OF MICHIGAN, THE COLLEGE DEMOCRATS AT MICHIGAN STATE UNIVERSITY, and THE MICHIGAN FEDERATION OF COLLEGE DEMOCRATS, by and through their undersigned counsel, file this COMPLAINT for DECLARATORY and INJUNCTIVE RELIEF against Defendant RUTH JOHNSON, in her official capacity as the Michigan Secretary of State (the "Secretary"), and Defendant SALLY WILLIAMS, in her official capacity as the Director of the Michigan Bureau of Elections, and allege as follows:

## NATURE OF THE CASE

1.     As this Court recently observed, "Michigan has one of the most restrictive voting regimes in the country." *Mich. State A. Philip Randolph Inst. v. Johnson*, No. 16-cv-11844, 2018 WL 3769326 at *7 (E.D. Mich. Aug. 9, 2018) ("*Michigan State A. Philip Randolph Institute III*"). This is especially true for Michigan's youngest voters, who are particularly vulnerable to restrictive voting laws and uniquely susceptible to voter confusion. Indeed, young voters in Michigan have historically, and to this day, been the target and victims of voting rules and requirements that are both intended to and have had the effect of making it substantially, and unjustifiably, more difficult for them to understand and navigate the process so as to exercise their right to participate in Michigan's elections and to have an equal opportunity and voice in determining who governs the communities in which they reside. As a consequence, young voters in Michigan vote at very low rates: the difference between overall turnout and youth turnout is now larger in Michigan than in any other state.

2.     This action specifically challenges: (i) Michigan Public Act 118 of 1999 ("Public Act 118"), which requires that a voter's residence for voter registration purposes match the address listed on her Michigan driver's license, *see* MICH. COMP. LAWS §§ 257.307(1)(c), 257.315(1); and (ii) MICH. COMP. LAWS ANN. § 168.509t(2), which is the current statute that requires that those who

register to vote by mail or through third-party registration drives must vote in-person the first time they vote (the "First-Time/In-Person Requirement"). While Public Act 118 and the First-Time/In-Person Requirement independently make registering and voting unduly confusing and difficult for young voters, in combination, they place nearly insurmountable barriers between many young voters and their fundamental right to vote.

3.   Public Act 118 is commonly known in Michigan as "Rogers' Law," after then-Republican State Senator Mike Rogers, who sponsored and championed the legislation. Rogers' Law, both by design and in practice, has made it significantly more difficult for eligible young voters—and, in particular, in-state college students who live and attend school in a region different than that where their family resides—to successfully navigate the process to exercise their right to participate in elections in Michigan. The legislative history of Rogers' Law shows that, at the time the law was proposed, legislators were well-aware of the disproportionate and disenfranchising impact its matching-address requirement would have on young voters, particularly college students, and that it was intended to have that very impact. Indeed, revealing his true motive in sponsoring the legislation, Rogers himself stated that it is a "slap in the face to democracy" to permit "students" to "be registered in one place and live in another." Statement of Sen. Rogers, Mich. Senate, Mar. 18, 1999 Transcript ("Tr.") at 9. According to

Rogers, "students" should "do it right," and "vote responsibly," *i.e. not* in their college communities; and they should be permitted to "register at the campus, if they feel that that's their home" *only* if they "have their driver's license moved there." *Id*. at 10-11 (emphasis added).

4.     Rogers' own electoral circumstances, preceding and immediately after passage of the law, provide further evidence that the intent was to discourage young, college students from voting, and that the law accomplished precisely that. Many in the Legislature had opined that this was the case, and it quickly proved to be true. Immediately after passage of Rogers' Law, Rogers went on to win—by 111 votes—the November 2000 election for Michigan's 8th Congressional District ("CD-8"), which includes a large student population and the campus of Michigan State University. Rogers owes his victory in large part to the confusion and disenfranchisement of young, college-student voters resulting from the wholly unnecessary and inherently confusing law he had just championed and worked to pass.

5.     Rogers' Law particularly and disproportionately impacts young voters, especially those who attend college in Michigan while still retaining a connection to their family's home elsewhere in the state. As compared to the general voting population, young voters are not only more likely to frequently move, but also to seek to maintain two addresses for different purposes: their

residential address where they attend school for most of the year (but which regularly changes at least once a year, and in many cases more frequently), and their address at their family's home. Rogers' Law has caused widespread confusion among these voters, who have little to no experience with voting and navigating the surrounding election processes.

6.     In particular, because of Rogers' Law, Michigan's young voters are regularly and persistently confused as to: (i) whether they may register to vote using their college address, if their driver's license lists their parents' address; (ii) whether changing their driver's license address will result in negative consequences, including in terms of preserving health insurance coverage under their parents' plans, qualifying as their parents' dependent for tax purposes, and maintaining scholarships and financial aid; (iii) whether they must apply for a new driver's license that reflects their on-campus address, if they seek to vote on-campus, and how to do so; and (iv) whether failure to comply with the matching-address requirement bars them from voting at their campus polling place, despite being registered there.

7.     In the years since its enactment, the confusion and disenfranchisement resulting from Rogers' Law has continued unabated. In fact, the cloud of confusion has stemmed from, and is reflected in, and perpetuated by, abundant and ongoing misinformation from election officials, local governments, universities, and the

press. Defendant, the Secretary, has not only done nothing to address these rampant and persistent problems, she has actively contributed to them. Just months ago, in March 2018, the Secretary delivered remarks to a group of students at Michigan State University and told students living on or near campus that their campus address is not really their home, and therefore it would not be "fair" for students to register at their campus address. She went on to say that if students do choose to register to vote at their school address, they must first apply for and obtain a completely new driver's license showing their school address prior to registering to vote at that address. Though neither of those statements comport with Michigan law, they comport *entirely* with the misleading and disenfranchising intent and resulting impact of Rogers' Law.

8.   Make no mistake: these students are almost universally legally eligible to vote in the communities in which they live and attend school. This is because they, like any other Michigan resident who is a U.S. citizen and 18 years of age or older, have a right to vote at their "residence," which Michigan law defines to mean the place where a person "sleeps, keeps his or her personal effects, and has a regular place of lodging." MICH. COMP. LAWS § 168.11(1). The fact that many of Michigan's student voters may wish to maintain, for the years during which they are attending college, their family's home address as their permanent residence address *on their driver's license*, should not *disqualify them from voting*

in the communities where they attend school and live for the vast majority of the year. But that is precisely the effect that was both intended by Rogers' Law and that has followed since its enactment.

9.     On top of the confusion and barriers to voting created by Rogers' Law, the First-Time/In-Person Requirement piles on an additional catch-22 for many young voters. College students, due to their young age, are more likely to be first-time voters, and because registration by mail or through a third-party registration drive is often the most convenient ways to register to vote in Michigan—particularly for young voters who often lack easy access to reliable transportation or, because they are brand new to the elections process, are more likely to not know where or how they may register in-person—many students register through those means. Indeed, many freshmen may not even become eligible to register to vote until they are already at their campuses, so they have no other option but to register by mail if they are registering using their family home address. The First-Time/In-Person Requirement *prohibits* these students from requesting an absentee ballot the first time they vote.

10.     As the Court recognized in *Michigan State A. Philip Randolph Institute III*, "[b]etween its prohibition on early voting and restriction on absentee voting, Michigan has one of the most restrictive voting regimes in the country," under which, "except for a limited number of qualified residents, all Michigan

7

voters must visit the polls on Election Day." 2018 WL 3769326 at *7. *See also Michigan State A. Philip Randolph Institute v. Johnson*, 833 F.3d 656, 665 (6th Cir. 2016) ("*Michigan State A. Philip Randolph Institute II*").[1] The result is the complete disenfranchisement of those young, first-time voters who attend school far from their family home and, who—for a myriad of reasons beyond their control, including lack of access to reliable transportation and busy, inflexible schedules—are unable to travel home to vote in-person on a Tuesday in the middle of the academic semester.

11.    As a direct result of Rogers' Law and the First-Time/In-Person Requirement, both independently and in combination, young voters in Michigan have faced unequal and consequential barriers in registering to vote and voting for the first time, and they have even been denied the right to vote entirely for reasons that have nothing to do with their qualification or eligibility to participate in Michigan elections. Indeed, in many cases, these laws have resulted in a chilling effect that has kept eligible young voters in Michigan from voting and registering to vote entirely due to widespread confusion about the laws' requirements and legal effects. If Rogers' Law and the First-Time/In-Person Requirement are not enjoined, Michigan's young voters, who are among the most vulnerable to

---

[1] Thirty-seven states allow early voting. 2018 WL 3769326, at *7.

restrictive voting laws, will continue to be deterred and prevented from exercising their right to vote.

12.    Because Rogers' Law was intended to and specifically targets and burdens the right to vote of Michigan's young voters, it violates the Twenty-Sixth Amendment of the United States Constitution. And because Rogers' Law and the First-Time/In-Person Requirement make it unduly confusing and difficult, and in some cases impossible, for Michigan's young voters, particularly college students, to exercise their fundamental right to vote and to participate in elections in the communities in which they live, both laws violate the First and Fourteenth Amendments.

## JURISDICTION AND VENUE

13.    Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the United States Constitution.

14.    This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343, because the matters in controversy arise under the Constitution and laws of the United States.

15.    This Court has personal jurisdiction over the Defendants, the Secretary of State and the Director of the Michigan Bureau of Elections, who are sued in their official capacity only.

16.     Venue is proper in the Southern Division of the U.S. District Court in the Eastern District of Michigan pursuant to 28 U.S.C. § 1391(b) and Local Court Rule 83.10, because, *inter alia*, the Defendants reside and do business in every county of the State and because a substantial part of the events that gave rise to Plaintiffs' claim occurred there, as Plaintiff, the College Democrats at the University of Michigan, is based in Ann Arbor, Michigan, and Plaintiff, the Michigan Federation of College Democrats, has eight chapters located in the Eastern District of Michigan.

17.     This Court has the authority to enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

18.     All conditions precedent to the maintenance of this case and Plaintiffs' claims have occurred, been performed, or otherwise been waived.

## PARTIES

19.     Plaintiff, the College Democrats at the University of Michigan,[2] is a student organization dedicated to increasing the participation and turnout rate of young voters in Michigan and to electing Democratic candidates. The College Democrats at the University of Michigan has over 1,000 members, around 60 of whom are active members, and all of whom are college students. To achieve its mission, the College Democrats at the University of Michigan devotes substantial

---

[2] The College Democrats at the University of Michigan are not acting on behalf or as representatives of the University of Michigan.

time, effort, and resources to encouraging voting by: (i) engaging in voter registration at various campus events; (ii) educating members of the campus community, including about candidates, issues, and the importance of voting; and (iii) engaging in get-out-the-vote efforts. As a direct result of Rogers' Law and the First-Time/In-Person Requirement, both the College Democrats at the University of Michigan's organizational mission and the voting rights of a substantial number of its members and constituency have been injured and will suffer irreparable injury. For example, many of the College Democrats at the University of Michigan's members who are confused into believing that they *must*, or otherwise choose to, register to vote using their family home address rather than their campus address, will find it highly difficult—and, in some cases, impossible—to travel to their family home on Election Day to vote for the first time if they registered by mail.

20.     Plaintiff, the College Democrats at Michigan State University,[3] is a student organization dedicated to empowering young voters in Michigan and to electing Democratic candidates. The College Democrats at Michigan State University has approximately 40 active members, all of whom are college students. To achieve its mission, the College Democrats at Michigan State University devotes substantial time, effort, and resources to encouraging voting by: (i)

---

[3] The College Democrats at Michigan State University are not acting on behalf or as representatives of Michigan State University.

engaging in voter registration at various campus events; (ii) educating members of the campus community, including about candidates, issues, and the importance of voting; and (iii) engaging in get-out-the-vote efforts. As a direct result of Rogers' Law and the First-Time/In-Person Requirement, both the College Democrats at Michigan State University's organizational mission and the voting rights of a substantial number of its members have been and injured will suffer irreparable injury. For example, many of the College Democrats at Michigan State University's members who are confused into believing that they must, or otherwise choose to, register to vote using their family home address rather than their campus address will find it highly difficult—and, in some cases, impossible—to travel to their family home on Election Day to vote for the first time if they registered by mail.

21.     Plaintiff, the Michigan Federation of College Democrats (the "Federation"), is a statewide political organization that seeks to build and maintain a strong youth voice in the State of Michigan. The Federation's members are comprised of 19 College Democrats chapters, all of which are run by college students who work across Michigan to mobilize student support for Democratic causes and to increase political accountability on issues relevant to Michigan youth. To achieve its mission, the Federation devotes substantial time, effort, and resources to encouraging voting by: (i) educating its members on the process of

voter registration through on-the-ground support and formal presentations at biannual conferences; (ii) providing financial and other support for members' on-campus voter registration efforts; and (iii) engaging in get-out-the-vote efforts, including social media campaigns. Thus, as a direct result of Rogers' Law and the First-Time/In-Person Requirement, the Federation's organizational mission and a substantial number of its members have been and will suffer injury to both their organizational mission and voting rights.

22.    Defendant, RUTH JOHNSON, is the Secretary of State of Michigan and is named as a Defendant in her official capacity. She is responsible for the administration and enforcement of the driver's license provisions of the Motor Vehicle Code. *See* MICH. COMP. LAWS § 257.202. In addition, she is Michigan's chief elections officer and is thus responsible for the uniform administration and implementation of Michigan election law, *see* MICH. COMP. LAWS § 168.21, including the administration and implementation of Rogers' Law. In this role, her responsibilities include voter outreach and voter education efforts. The Secretary is also responsible for exercising supervisory control over local election officials, and she, personally and through the conduct of her employees, officers, agents, and servants, acted under color of state law at all times relevant to this action.

23.    Defendant, SALLY WILLIAMS, is the Director of the Michigan Bureau of Elections and is named as a Defendant in her official capacity. As the

Director of Elections, she is responsible for supervising the Bureau of Elections. MICH. COMP. LAWS ANN. § 168.32(1). In this role, she is "vested with the powers and shall perform the duties of the secretary of state under his or her supervision, with respect to the supervision and administration of the election laws." MICH. COMP. LAWS ANN. § 168.32(1).

## FACTUAL ALLEGATIONS

### I.   Michigan's Restrictive Voting Regime

24.   As this Court recently observed, "Michigan has one of the most restrictive voting regimes in the country." *Mich. State A. Philip Randolph Inst. v. Johnson III*, 2018 WL 3769326, at *7.

25.   Michigan has an extremely onerous and outdated voter registration system. It is one of only 13 states that does not provide for online registration.[4] Thus, a qualified voter may only register to vote by mail (including through a third-party registration drive) or in person at the office of the county or municipal clerk, a department of state branch office (comparable to department of motor vehicle ("DMV") offices in other states), or other voter registration location specifically designated by the Secretary. MICH. COMP. LAWS § 168.509v. Further,

---

[4] *Online Voter Registration*, Nat'l Conference of State Legislatures (Dec. 6, 2017), http://www.ncsl.org/research/elections-and-campaigns/electronic-or-online-voter-registration.aspx.

while 17 states and the District of Columbia permit same-day registration,[5] Michigan requires that voter registration applications be submitted at least 30 days before the election—the longest period permissible under federal law. MICH. COMP. LAWS § 168.497.[6] And, while 13 states and the District of Columbia automatically register eligible citizens who interact with the DMV or other state agencies unless those voters opt-out,[7] Michigan requires that voters opt-in in order to be registered to vote. *See* MICH. COMP. LAWS § 168.500a.[8]

26.     Once eligible voters are registered, most states allow them to cast a ballot before Election Day, either during an early voting period or by requesting an

---

[5] *Same Day Voter Registration*, Nat'l Conference of State Legislatures (March 27, 2018), http://www.ncsl.org/research/elections-and-campaigns/same-day-registration.aspx.

[6] The National Voter Registration Act requires that states ensure a voter is registered "if the valid voter registration form of the applicant is postmarked not later than the lesser of 30 days, or the period provided by State law, before the date of the election." 52 USC § 20507(a)(1)(B). Michigan is one of only 10 states that requires registration not less than 30 days before an election. *Voter Registration Deadlines*, Vote.org (Jan. 13, 2018), https://www.vote.org/voter-registration-deadlines/.

[7] *See History of AVR & Implementation Dates*, Brennan Center for Justice (June 24, 2018), https://www.brennancenter.org/analysis/history-avr-implementation-dates.

[8] "The secretary of state . . . shall afford a person who appears in a department of state branch office or a person who applies for renewal of an operator's or chauffeur's license . . . an opportunity to complete an application to register to vote or to change the person's voting registration name or address. . . ." MICH. COMP. LAWS § 168.500a.

absentee ballot.[9] Michigan, however, is one of only 13 states that do not permit some form of early voting or no-excuse absentee voting. *See* MICH. COMP. LAWS § 168.758; *see also Michigan State A. Philip Randolph Institute II*, 833 F.3d at 665. In addition to prohibiting early voting, Michigan imposes severe limitations on absentee voting, permitting voters to request an absentee ballot only if they meet one of the following six narrow criteria: (a) physical disability; (b) religious reason prevent attendance at the polls; (c) service as a precinct inspector in another precinct; (d) being 60 years of age or older; (e) absence from the township or city for the entire period the polls are open; or (f) confinement in jail awaiting arraignment or trial. *Id.* Even those who qualify for an absentee ballot must request one prior to each election unless their jurisdiction chooses to maintain a permanent absent voter list, which no jurisdiction is required to do; and clerks are prohibited from mailing absentee ballot applications without having received a verbal or written request.[10]

27.    Within this already restrictive voting regime, Michigan's lawmakers and election officials have had a history of targeting young voters, imposing rules

---

[9] *Absentee and Early Voting*, Nat'l Conference of State Legislatures (Aug. 17, 2017), http://www.ncsl.org/research/elections-and-campaigns/absentee-and-early-voting.aspx.
[10] Michigan Sec'y of State, Election Officials' Manual Ch. 6 at 3 (2017), https://www.michigan.gov/documents/sos/VI_Michigans_Absentee_Voting_Process_265992_7.pdf.

and requirements that directly suppress registration and turnout among this population, particularly college students.

28.     Voter suppression targeting this group of voters in particular can be quite consequential. The electorate in Michigan has long been very closely divided in its support for the two major political parties. Most recently, in 2016, 48% of voters who cast ballots in Michigan's 14 races for seats in the U.S. House of Representatives voted for Republican candidates, while 47% voted for Democratic candidates. Donald Trump won the state with only 47.50% of the vote, as compared to former Secretary of State Hillary Clinton's 47.27% of the vote share—a difference of only 10,704 votes.

29.     College students comprise more than seven percent of Michigan's voting-age population and are more likely than the general population to vote for Democratic Party candidates. In Fall 2000, 542,652 students were enrolled in Michigan institutions of higher education, while the voting-age population in 2000 was around 7.34 million. By Fall 2016, the number of students had risen to 594,895, while the estimated voting-age population was 7.68 million. At Michigan State University alone, 43,366 students were enrolled as of Fall 2000, and that number had grown to 50,340 as of Fall 2016.

30.     Although recent efforts to suppress the young (and particularly, student) vote have been more subtle, Michigan has a long history of explicitly making it more difficult for that population to participate in elections.

31.     For over 75 years, beginning as early as 1893, Michigan's statutory provision defining residency for voting purposes had been interpreted to mean that "a student must overcome a rebuttable presumption that he is not a resident in the locale of the institution of learning." *Wilkins v. Bentley*, 385 Mich. 670, 675 (1971) (citing *Wolcott v. Holcomb*, 97 Mich. 361 (1893); *People v. Osborn*, 170 Mich. 143 (1912); *Attorney General ex rel. Miller v. Miller*, 266 Mich. 127 (1934)), abrogated on other grounds as explained in *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 479 Mich. 1, 33, 740 N.W.2d 444, 462 (2007).[11]

32.     This interpretation was motivated by the fear "that the students would have a significant political impact if they were granted the elective franchise[,] . . . overwhelming the townspeople at the polls." *Wilkins*, 385 Mich. at 691. As the

---

[11] The provision in effect at the time, like the current statute, defined residence "for registration and voting purposes . . . to mean that place at which a person habitually sleeps, keeps his or her personal effects and has a regular place of lodging." *Wilkins*, 385 Mich. at 675 (quoting MICH. COMP. LAWS ANN. § 168.11(a)). And "[s]hould a person have more than 1 residence, . . . that place at which such person resides the greater part of the time shall be his or her official residence . . . ." *Id.* As relevant here, the statute further specified (and still does) that "[n]o elector shall be deemed to have gained or lost a residence . . . While a student at any institution of learning . . . ." *Id.* (quoting MICH. COMP. LAWS ANN. § 168.11(b)).

Michigan Supreme Court later noted, "[c]learly, . . . [the law], as applied to students, disenfranchise[d] many interested and concerned citizens." *Id.* at 687.

33.    Not until 1971, after eight University of Michigan students sued following denial of their voter registration applications in Ann Arbor, did the Michigan Supreme Court invalidate that rebuttable presumption, holding "students must be treated the same as all other registrants. No special questions, forms, identification, etc., may be required of students." *Wilkins*, 385 Mich. at 694. As the Court explained, "while the law defining voting residence for other citizens . . . is clear and unequivocal, the effect of the law, as applied to students, . . . varie[d] from city to city and from local clerk to local clerk." *Id.* at 677. Therefore, in Michigan, "the standards which students must meet in order to vote in the locality in which their college is located . . . [were] so vague as to be tantamount to no standards; thus each registration clerk determine[d] himself which factors will overcome the presumption against student registrability in his city." *Id.* at 677-68.

34.    Indeed, "Ann Arbor use[d] an elaborate questionnaire before allowing students to register," and plaintiffs in the case "were asked questions concerning bank accounts; where they obtained their support; whether they owned or leased property; and where they spent their vacations." *Id.* at 678. As the court explained, however, "these questions concerning wealth, property ownership, and travel, if

used as criteria to establish residence for voting purposes, are constitutionally impermissible." *Id.*

35.    Despite the Michigan Supreme Court's admonition that "it is no longer constitutionally permissible to exclude students from the franchise because of the fear of the way they may vote," the specter and manifestations of this impermissible fear persist in Michigan's electoral systems.

36.    For example, in Ann Arbor, two City Council members represent each of the city's five wards. City of Ann Arbor City Charter §§ 1.3, 4.1.[12] Despite there being over 46,000 students enrolled at the University of Michigan in Ann Arbor in 2017[13]—almost 38% of the total population of Ann Arbor[14]—students do not approach a majority of any of the city's wards. Instead, the ward boundaries have been drawn to radiate out from the center of campus, so that each ward is shaped like a slice of a pie, with the smallest part of that pie constituting a fraction of campus. The result is that the student population is effectively split among the five wards and their voting power sufficiently negated so as to make it extremely

---

[12]                                            http://annarborchronicle.com/wp-content/uploads/2012/05/CharterNovember2011.pdf; *see also City Council*, City of Ann Arbor Michigan, https://www.a2gov.org/departments/city-council/Pages/Home.aspx ("The City Council consists of the mayor and 10 Council members, two from each of Ann Arbor's five wards.").

[13] *Enrollment, Ann Arbor Campus*, University of Michigan Office of Budget and Planning (Oct. 26, 2017), http://obp.umich.edu/root/facts-figures/students/admissions-enrollment/enrollment-umaa/.

[14] *See QuickFacts Ann Arbor city, Michigan*, U.S. Census Bureau (July 1, 2017), https://www.census.gov/quickfacts/fact/table/annarborcitymichigan/PST045217.

difficult for them to command enough of the vote share to elect candidates of their choice to the City Council.[15]

37.      As will be discussed, barriers to student voting also persist on the state level, including, in particular, through the two laws that are the subject of this challenge.

## II.   Rogers' Law and the Matching Address Requirement

38.   Rogers' Law—like the rebuttable presumption against residency that Michigan historically applied to students in college communities, and the slicing up of the student population by Ann Arbor's ward boundaries—is yet another effort to hamper the electoral power and participation of young voters in Michigan.

39.   Introduced on February 16, 1999 by then-State Senator Mike Rogers, Rogers' Law passed the Republican-controlled Legislature along party lines. Mich. H. Journal, 90th Leg., Reg. Sess., 1358-59 (June 8, 1999); Mich. S. Journal, 90th Leg., Reg. Sess., 1118-19 (June 10, 1999). [16]

---

[15] *See Ward Boundaries Map, City Clerk, City of Ann Arbor, Michigan*, https://www.a2gov.org/departments/city-clerk/Elections/Pages/WardBoundariesMap.aspx; *see also* Austen Hufford, *Drawing the Vote: Ann Arbor City Wards Split Students*, The Michigan Daily (Feb. 3, 2015), https://www.michigandaily.com/article/drawing-vote-ann-arbor-city-wards-split-students.

[16] Prior to the enactment of Rogers' Law in 1999, Michigan did not require voters to use the same address for purposes of their driver's license and voter registration. On March 1, 1999, then-Attorney General of Michigan, Jennifer Granholm, issued a formal opinion so concluding. *See* 1999 Mich. OAG No. 7010 (opining voter could maintain a driver's license address *different* from his voter registration

40.    Rogers' Law amended Michigan's Motor Vehicle Code to require that the address listed on a voter's Michigan driver's license match the address at which that voter is registered to vote. In relevant part, the statute states:

The following notice shall be included to inform the applicant that under sections 509o and 509r of the Michigan election law, 1954 PA 116, MCL 168.509o and 168.509r, the secretary of state is required to use the residence address provided on this application as the applicant's residence address on the qualified voter file for voter registration and voting:

"NOTICE: Michigan law requires that the same address be used for voter registration and driver license purposes. Therefore, if the residence address you provide in this application differs from your voter registration address as it appears on the qualified voter file, the secretary of state will automatically change your voter registration to match the residence on this application, after which your voter registration at your former address will no longer be valid for voting purposes. A new voter registration card, containing the information of your polling place, will be provided to you by the clerk of the jurisdiction where your residence address is located."

MICH. COMP. LAWS § 257.307(1)(c); *see also* MICH. COMP. LAWS § 257.315(1)

("The secretary of state shall provide the person changing his or her residence address the notice required by section 307(1)(c) that, under . . . MCL 168.509o and 168.509r, the secretary of state is required to use the residence address provided on

---

address, as Section 509o(3) of the Michigan Election Code, which stated that "[t]he secretary of state or a designated voter registration agency shall not allow a person to indicate a different address than the address in either the secretary of state's or designated voter registration agency's files to be placed in the qualified voter file," "does not prohibit a voter from registering to vote at an address different from that listed on his or her driver's license").

this change of address application as the person's residence address on the qualified voter file for voter registration and voting.").

41.     Pursuant to Rogers' Law, Michigan requires that a driver "who changes his or her residence before the expiration of a license . . . shall immediately notify the secretary of state of his or her new residence address." MICH. COMP. LAWS § 257.315(1).[17] When the Secretary receives a change of address notification, she "shall change the person's driver license record to indicate the new residence address." MICH. COMP. LAWS § 257.315(2). The Secretary is then required to send the Michigan driver "a new license or a label or some other mechanism containing the new residence address," which must be affixed to the driver's license. *Id.*

42.     If the holder of a Michigan driver's license fails to "report a change of his or her residence address" and "there is no response to a notice mailed to the residence address shown by the record of the secretary of state or if the person has provided the secretary of state a mailing address different from his or her residence address and there is no response to a notice mailed to that mailing address," "the

---

[17] The statute specifies that such a change of address notification must be made "in a manner prescribed by the secretary of state and may include notification by personally appearing at a branch office of the secretary of state or other location designated by the secretary of state, or a notification by mail, telephone, electronically, by submitting a voter registration application unless the person registers to vote in a city, village, or township that prohibits the operation of motor vehicles by law or ordinance, or by any other means prescribed by the secretary of state." MICH. COMP. LAWS § 257.315(1).

secretary of state may immediately suspend or revoke his or her license." MICH. COMP. LAWS § 257.315(3). In addition, "[a] person who fails to report a change of his or her residence address is responsible for a civil infraction." *Id.*

43. If an individual "knowingly report[s] a change of address to the secretary of state for himself or herself that is not his or her residence address," that individual is subject to a misdemeanor charge, "punishable by imprisonment for not more than 93 days or a fine of $1,000.00, or both." MICH. COMP. LAWS § 257.315(4). In addition, "the secretary of state may suspend the person's operator's or chauffeur's license for 6 months." *Id.*[18]

## III. The Legislative History of Rogers' Law Evidences Its Discriminatory Intent

44. The legislative history of Rogers' Law demonstrates that the legislators who sponsored, promoted, and enacted the law were well-aware that the intent of the legislation was to discourage and make it more difficult for young people, particularly college students, to vote, and especially in their college communities.

45. During the floor debate, Democratic State Representative Lynne Martinez described "young people" as "the *targets of the bill*." Statement of Rep. Lynne Martinez, Mich. House of Representatives, June 2, 1999 Tr. at 7 (emphasis

---

[18] In the event of a second misdemeanor charge, "the secretary of state shall revoke the person's operator's or chauffeur's license." MICH. COMP. LAWS § 257.315(5).

added). She asserted that Rogers' Law was introduced "to restrict access to the ballot of certain people who may wish to vote for [a Republican legislator's] opponent," and stated, "I think that trying to restrict [college students'] access to the ballot, where they live a good percentage of their lives while they're in college, is absolutely wrong." *Id*.

46.     Democratic State Representative Mark Schauer similarly stated on the floor that "the real motive" of the law is to "mak[e] it more difficult for young people to vote in their college communities." Statement of Rep. Mark Schauer, Mich. House of Representatives, June 2, 1999 Tr. at 16.

47.     Similarly, State Representative David Woodward described Rogers' Law as "a way to cripple the ability for young people to take an active role in a process that is critical to our society, critical to our democracy, and critical to the livelihood of our state." Statement of Rep. David Woodward, Mich. House of Representatives, June 2, 1999 Tr. at 18-19.

48.     Representative Elizabeth Brater stated on the floor, that Rogers' Law would "limit the rights of our youngest citizens who have the right to vote to vote" and would "creat[e] in them the appearance that you do not wish them to participate in a democratic process." Statement of Rep. Liz Brater, Mich. House of Representatives, June 2, 1999 Tr. at 23.

49.     Put another way, as State Representative A.T. Frank stated, "[w]e now put up another barrier to stop [young voters] from their coming into the process." Statement of Rep. A.T. Frank, Mich. House of Representatives, June 2, 1999 Tr. at 25.

50.     This particular brand of criticism was so wide-spread that even the analysis of Rogers' Law prepared by the House Legislative Analysis Section at the time the bill was under consideration by the Michigan House (the "Legislative Analysis") stated that "some people suspect this is the *intent of the bill, to dilute student voting*." Michigan House Legislative Analysis of New Voter Registration Requirement, Senate Bill 306, Driver License/Voter Address, House Legislative Analysis Section 3 (May 26, 1999) (emphasis added).[19]

51.     The legislative history of Rogers' Law also demonstrates that legislators were well-aware of the disproportionate impact that Rogers' Law would have on young voters, especially college students, and that it would lead to significant burdens on their right to vote, and even disenfranchisement.

---

[19] Bill analyses are nonpartisan summaries of pending legislation prepared after a committee reports a bill to the full House. The House Legislative Analysis is prepared by the nonpartisan House Fiscal Agency for use by House members in their deliberations, and includes "a description of the problem being addressed, arguments for and against the bill, and positions of interested organizations." House Fiscal Agency, About Us, https://www.house.mi.gov/hfa/About.asp (last accessed Aug. 29, 2018).

52.    On June 2, 1999, during debate on the bill on the floor of the Michigan House of Representatives, Democratic State Representative Laura Baird stated that "we're back to the issue of voters' rights and whether or not the State of Michigan is going to deny the right of people who aren't living at their residence to vote," "primarily students." Statement of Rep. Laura Baird, Mich. House of Representatives, June 2, 1999 Tr. at 2.

53.    Democratic State Representative Deborah Cherry stated that if Rogers' Law had been the law when she was in college, it "would have made voting difficult for me when I was a student and for many of you who voted in the place where you went to college." Statement of Rep. Deborah Cherry, Mich. House of Representatives, June 2, 1999 Tr. at 6.

54.    Democratic State Representative Julie Dennis recognized that Rogers' Law would result in "driv[ing] young [people] away from the polls." Statement of Rep. Julie Dennis, Mich. House of Representatives, June 2, 1999 Tr. at 26.

55.    Democratic State Representative Jack Minore also recognized that college students "would find it difficult to vote" under Rogers' Law, which "would be restrictive of their voting rights." Statement of Rep. Jack Minore, Mich. House of Representatives, June 2, 1999 Tr. at 11-12.

56.     Democratic State Representative Paul Gieleghem characterized Rogers' Law as "creat[ing] too many hoops" for college student voting. Statement of Rep. Paul Gieleghem, Mich. House of Representatives, June 2, 1999 Tr. at 13.

57.     Democratic Representative Vera Rison asked: "why we are saying to our children we want you when you leave home to change your address," and "then when you come back home, you can't vote in an election because of the change of address." Statement of Rep. Vera Rison, Mich. House of Representatives, June 2, 1999 Tr. at 33.

58.     Democratic State Senator Dianne Byrum issued a floor statement protesting the passage of Rogers' Law, after an amendment to exempt college students from its matching address requirement failed. She emphasized that "[w]e should be about encouraging people to participate in one of the most basic rights— voting"; "[w]e should not be discouraging that participation." Statement of Sen. Byrum, J. OF THE SENATE No. 26 at 371 (Mar. 23, 1999), http://www.legislature.mi.gov/(S(tfi3vaw0qxgn2natks1lzml2))/documents/1999-2000/Journal/Senate/pdf/1999-SJ-03-23-026.pdf (emphasis added).

59.     In contrast, there were multiple statements by legislators who sponsored or supported the bill that made clear that, not only were they unconcerned about the negative impact it would have on the voting rights of

students, but that, in their view, students should *not* vote in the communities in which they attend school.

60.     Senator Rogers himself revealed that his motives for passing the legislation centered around student voters, stating that it is a "slap in the face to democracy" to permit students to "be registered in one place and live in another." Statement of Sen. Rogers, Mich. Senate, Mar. 18, 1999 Tr. at 9. According to Rogers, "students" should "do it right," and "vote responsibly," *i.e.* not vote in their college campus communities. *Id.* at 10-11. Instead, they should be permitted to "register at the campus, if they feel that that's their home" only if they "have their driver's license moved there." *Id.*

61.     Similarly, Republican Representative Rick Johnson, who voted for Rogers' Law, stated that "you should vote in one place and make that decision," whether they vote "in their university town or back home." Statement of Rep. Johnson, Mich. House of Rep., June 3, 1999 Tr. at 29-30. In making these misleading statements suggesting that students were prone to commit voter fraud by registering and/or voting in more than one place, neither Senator Rogers nor Representative Johnson referenced any evidence that any such fraud actually occurred.

62.     The Legislative Analysis also informed members of the Michigan Legislature of concerns that young voters, particularly college students, would be

disproportionately impacted. Under arguments against the bill, the Legislative Analysis identified "[c]ollege students," as "perhaps the most obvious example" of voters who are likely to have "what might be considered multiple residences and allegiances," and thus be directly impacted by Rogers' Law. SB 306 House Legislative Analysis at 3, Driver License/Voter Address, House Legislative Analysis Section (May 26, 1999). It also stated that, "[a] student who leaves the home of parents to spend nine months per year for four or five (or more) years at school might want to leave the address on his or her driver license the same but register to vote and participate in politics where they are in school." *Id.* "Such a student might move numerous times during the school years and changing a driver license address each time would be a nuisance." *Id.* Thus, "[c]ritics of the bill are concerned that the legislation will discourage voting and decrease participation, particularly among students in college towns." *Id*.

63.   Elections officials and non-profit organizations also protested that Rogers' Law was meant to make it harder for young voters, particularly college students, who are more likely to support Democratic Party candidates, to vote.

64.   The non-partisan League of Women Voters of Michigan similarly concluded that "1999, PA 118 . . . was passed by the Michigan Legislature to *target students* by requiring the resident address on the driver's license to be the same as the resident address." Update: Michigan's Voting Laws, LEAGUE OF

WOMEN VOTERS OF MICHIGAN (July 30, 2014), http://lwvmi.org/issues/documents/VotingRtsupdate8-14.pdf (emphasis added).

65.    Young voters themselves also believed that Rogers' Law was designed to target student voters. For example, contemporaneously with its passage, University of Michigan student Abe Raffi stated, "[t]his law attempts to silently *drag students out of the democratic process*." Six University Student Assemblies File Suit to Prevent Implementation of New Law," American Civil Liberties Union (February 24, 2000), http://www.aclumich.org/article/six-university-student-assemblies-file-suit-prevent-implementation-new-law (emphasis added).

## IV.    Rogers Had an Clear Incentive to Suppress the Influence of Young Voters

66.    In addition to the legislative history and contemporary public reaction discussed above, Rogers' own electoral circumstances, both preceding and immediately after passage of the law, further evidence that the intent of the law was to discourage young, college students from voting, and that the law accomplished precisely that.

67.    On March 28, 1999, then-Representative Debbie Stabenow announced she would run for U.S. Senate and, therefore, would not seek reelection to a third term as the U.S. Representative from Michigan's Eighth Congressional District ("CD-8"). By that time, Rogers had already organized his principal campaign

committee, which filed with the Federal Election Commission on March 19, 1999. Democrat Dianne Byrum formally announced her candidacy on April 12, 1999. CD-8 included only part of Rogers' State Senate District, but it encompassed all of Byrum's State Senate District, including the campus of Michigan State University.

68.     CD-8 was a crucial swing district in the 2000 House elections. Early expectations were that the race would be tight, and early polling confirmed these expectations.[20] The student vote in East Lansing, however, was known to be a heavily Democratic constituency in CD-8. In the seven precincts on the Michigan State University campus, Byrum won more than 63% of the vote in her 1998 race for State Senate. And Democrat Debbie Stabenow received more than 76% of the vote of those precincts in her 1998 contest for CD-8, a race that she won with only 57% of the vote of the district as a whole.

69.     Rogers clearly stood to benefit electorally from the passage of Rogers' Law. And, as illustrated by the legislative history discussed above, Rogers was well-aware of concerns about the disproportionate impact that Rogers' Law would have on college students and that it would suppress the influence of young, college-student voters, particularly Michigan State University students in the CD-8

---

[20] *See Competitive House Race Chart*, COOK POLITICAL REPORT 53 (June 14, 1999) (noting CD-8 had a 0.3% Democratic lean in the Cook Presidential Vote Index and rating the 2000 race as a toss-up); *A Hardware Democrat, and a Republican of Steel*, NATIONAL JOURNAL'S CONGRESS DAILY (Sept. 27, 1999) (reporting a 39%-34% lead for Byrum in a Sept. 12¬–14, 1999 poll).

race. Public criticism was pointed: in addition to the public concerns discussed above, the press reported that "[t]wo college groups - the College Democrats of Michigan and the Michigan State University Democrats - are saying the author of the legislation, state Sen. Mike Rogers, R-Brighton, is purposely trying to make it difficult for students to vote." THE ASSOCIATED PRESS STATE & LOCAL WIRE (Apr. 19, 1999).

70.   And, as discussed below, the impact of Rogers' Law was just as anticipated.

## V.   Rogers' Law Created Massive Confusion and Burdens for Student Voters, Prompting Students to Challenge the Law in Court

71.   In the immediate aftermath of the passage of Rogers' Law, there was widespread confusion and concern regarding the abridgment of the right to vote. Students and election officials were unaware of how to comply with the requirements, leading to students being denied the right to vote by elections officials.

72.   In the first election in which Rogers' Law was implemented, "many students were unaware of the law until they were turned away from the East Lansing polls on Election Day." *Fix the System,* THE STATE NEWS (Nov. 16, 2000), http://statenews.com/index.php/article/2000/11/Fix_the_system. Indeed, "[t]he law complicated the process, especially for students who were voting for the first time and were unfamiliar with the process." *Id.*

73.   Further, when Rogers' Law was first implemented, "rumors [were] spread that by registering in East Lansing [or another college town] instead of at home, students risked being kicked off their parent's health insurance plans and having their credit rating adversely effected," which "kept more students away from the polls in East Lansing." Philip Moon, *supra*. These rumors were false, but they were pervasive and effective in suppressing the student vote, and, as will be discussed, they have persisted.

74.   Indeed, analysis of precinct-level data from the Secretary's office from 1998 to 2014 reveal a large initial impact on registration and voting in college areas, and that impact has persisted over time. In particular, Michigan's major college towns experienced a decrease in turnout relative to their surrounding counties in the two elections immediately after the reform, and in five out of six counties examined, this increased turnout gap has persisted to this day.

75.   These immediate impacts of Rogers' Law prompted four Michigan students and representatives from six university student assemblies to file a lawsuit challenging the law, alleging, *inter alia*, that "[t]he law will discourage voter registration and political activity among college students." *See* Complaint at 2, *Cent. Mich. Univ. Student Gov't Ass'n v. Miller*, No. 00-10070 (E.D. Mich. Feb. 24, 2000) ("*CMUSGA v. Miller* Compl."). According to the lawsuit, in which the students were represented by the local Michigan affiliate of the American Civil

34

Liberties Union, Rogers' Law "will place serious burdens on the fundamental right to vote, particularly for college students, who, because of their frequent moves within the college community generally maintain a fixed driver's license address as their family home, but whose residence in the college community entitles them to maintain their voting registration there." *Id.*[21]

76.    The Court, however, rejected plaintiffs' claims, concluding that they were not likely to succeed on the merits and denying plaintiffs' request for a preliminary injunction. Opinion and Order Denying Defendant's Motion for Change of Venue and Denying Plaintiffs' Motion for Preliminary Injunction, *Cent. Mich. Univ. Student Gov't Ass'n v. Miller*, No. 00-10070 (E.D. Mich. Apr. 17, 2000).

77.    In so finding, the Court emphasized that, the plaintiffs, who filed suit shortly after the law's enactment and obtained a decision before Rogers' Law had been in place for any major election, "offered only conjecture in support of their

---

[21] The plaintiffs brought five causes of action, claiming that Rogers' Law is: (1) preempted by the National Voter Registration Act ("NVRA"); (2) imposes on Michigan citizens an impermissible burden on the fundamental right to vote and deprives them of equal protection in violation of the Fourteenth Amendment to the U.S. Constitution; (3) invidiously discriminates between long-term residents of Michigan and those who have more recently become residents, impermissibly burdens the right to travel, and deprives Michigan citizens of equal protection in violation of the Fourteenth Amendment; (4) violates Article 4, § 25 of the Michigan Constitution by amending the Michigan Election Law by reference; and (5) violates Article 4, § 24 of the Michigan Constitution in that its title does not express its evident object of amending the Michigan Election Law. *CMUSG v. Miller* Comp. at 14-18.

claim that the discouragement of college student voting motivated [Rogers' Law]," *id.* at 25, and that, "the only real consequence of the new law is that students will be forced to have their college address on their driver's licenses." *Id.* at 7.

78. At the same time, the Court acknowledged that "[i]t is understandable that confusion on the part of students might hamper voter registration efforts," *id.* at 8, and stated that "Plaintiffs' most compelling argument of harm is that college students are now confused and apprehensive about voting," *id.* at 9. Nonetheless, the Court dismissed those compelling concerns based on assurances from Christopher M. Thomas, then Michigan's Director of Elections, that a "massive" "educational effort is underway," including a "public information campaign to inform college students about the implementation of" the law and plans to "place advertisements in 50 college newspapers." *Id.* at 8. Thus, the Court stated, "[h]opefully, the planned educational effort will alleviate [students'] fears and encourage participation." *Id.* at 29.

79. Upon information and belief, no "massive" public education campaign, however, actually materialized, and whatever public education has been conducted has plainly not alleviated the widespread and *ongoing* confusion that Rogers' Law has injected between young people and their right to vote.

80. To the contrary, and as discussed further below, misleading and flat-out wrong information has been widely disseminated from multiple authoritative

and trusted sources, including the Defendant Secretary, local election officials, universities, and the media.

81.    Over time, that confusion and misinformation, in combination with other aspects of Michigan's particularly restrictive voting regime, including specifically the First-Time/In-Person Requirement, has had the pronounced effect of unduly burdening the right to vote of young voters, and, in many cases, as evidenced in particular by marked and increasing disparities in younger voter turnout—particularly in college communities—has effectively disenfranchised them altogether.

82.    While the evidence of this impact may have been unclear (or "speculative") in 2000, it has since become undeniable.

## VI.    After Implementation of Rogers' Law, Rogers Won the CD-8 Race by a Razor-Thin Margin in the 2000 Election, When Hundreds of Michigan State University Students were Turned Away at the Polls

83.    In the aftermath of the students' failed legal challenge against Rogers' Law, Rogers went on to win the CD-8 race by a razor-thin margin in the November 2000 election.

84.     In the final official tally, Rogers became a U.S. Congressman by a margin of only 111 votes (0.0373% of the 297,609 votes cast).

85.    Voters at the seven precincts on the Michigan State campus overwhelmingly voted for Byrum over Rogers, 3,063 to 948, or 76% to 24%.

86.     But turnout at the precincts on the Michigan State campus was depressed and student voters in particular had difficulty navigating the elections process to successfully cast ballots.

87.     "This election more than any other was rife with confusion," said East Lansing City Manager Ted Staton. Jamie Gumbrecht, *Task Force Looks to Help Voters*, STATE NEWS (Apr. 3, 2001), https://statenews.com/article/2001/04/task_force_looks_to_help_voters.

88.     "[Rogers' Law] complicated the process, especially for students who were voting for the first time and were unfamiliar with the process." *See Fix the System*, THE STATE NEWS (Nov. 16, 2000), http://statenews.com/index.php/article/2000/11/Fix_the_system).

89.     It was reported that Rogers' electoral victory in the 2000 congressional election, "was likely influenced by . . . [a] law requiring voters to vote where their driver's license says they live" as "[t]his prevented many Michigan State University students, who tend to be Democratic, from voting from their campus addresses, as they have in the past." Jack Lessenberry, *Its Strictly the Party Line in Michigan Primary*, THE MICHIGAN BLADE (Aug. 4, 2002), http://www.toledoblade.com/JackLessenberry/2002/08/04/It-s-strictly-the-party-line-in-Michigan-primary.html.

90.    In response to the 2000 election, a bipartisan 18-member Michigan Task Force on Voting Reform received testimony at six hearings across the state and made a public report in September 2001. Indeed, 20 Michigan State University students testified before the Task Force on Voting Reform that they were denied the opportunity to vote. *Id.*

91.    The problems were so egregious that Senator Byrum initially called for a revote in the campus precincts. As she later said, Rogers' Law "was purely aimed at Michigan State University and trying to shut down the student vote . . . because those would obviously advantage me. That was my Senate District. I was better known; I worked the campus aggressively." Marisa Schultz, *The Rise of Mike Rogers*, DETROIT NEWS (July 4, 2013). Senator Byrum also said: "Students had difficulty voting. I think they would have had an impact on the election. We'll never know." Gumbrecht, *Task Force*, *supra*.

92.    The impact Rogers' Law had on student voting is further shown by the precipitous drop in registration in Michigan's largest college towns immediately following its implementation.

93.    Less than two years after its enactment, the Detroit *Free Press* reported that, as a "result" of Rogers' Law, "fewer students are registering to vote in Ann Arbor, East Lansing, Kalamazoo and Mt. Pleasant, home to some of Michigan's largest universities." Jamie Gumbrecht, *New Law Affects College*

*Voters; Registration Change May Lower Numbers*, DETROIT FREE PRESS (Oct. 5, 2002).

94.     From 2000 to 2002, "registered voter numbers have dropped from 29,463 to 26,242 in East Lansing and 91,847 to 84,512 in Ann Arbor." *Id.* This was a total drop in voter registration of 13.6% in Ann Arbor, and 11% in East Lansing. Philip Moon, *supra*. *See also* Gumbrecht, *supra* ("[S]ome students. . . offer a cold stare to registration drive workers" due to Rogers' Law).

## VII.  Legislative Efforts to Repeal Rogers' Law, Though Unsuccessful, Detailed the Law's Negative Impact on Young Voters

95.     After the detrimental impact on young voters resulting from implementation of Rogers' Law, Democratic members of the Michigan Legislature repeatedly attempted to account for, and address, its negative consequences. Though each of these efforts failed, the legislative history surrounding them further highlight the discriminatory impact and intent of Rogers' Law.

96.     For example, Representative Woodward, who voted against Rogers' Law, introduced an amendment in 2001 to Senate Bill 173, a bill to eliminate straight-ticket voting, which would have required the Secretary to "study and report back to the legislature . . . the deleterious effects on students and young voters of Public Act 118 of 1999." Mich. H. Journal, 91st Leg., Reg. Sess., 2594 (Dec. 6, 2001). The amendment failed on a strict party-line vote of 46 Democrats in favor and 55 Republicans against.

97.   In 2004, State Senator Brater proposed a four-bill package to repeal Rogers' Law. That failed on another strict party-line vote of 16 Democrats in favor of passage and 22 Republicans against. Mich. Sen. Journal, 92nd Leg., Reg. Sess., 1885, 1894 (Sept. 15, 2004).

98.   In 2007, State Representative Rebekah Warren introduced House Bill 4447, which would have provided that "an individual may change the residence address on his or her operator's or chauffeur's license issued pursuant to the Michigan vehicle code . . . or official state personal identification card. . . , without changing his or her address for purposes of the qualified voter file or may change his or her address on the qualified voter file without changing the residence address on his or her operator's or chauffeur's license issued under the Michigan Vehicle Code . . . or official state personal identification card . . . ."

99.   The Michigan House Legislative Analysis of House Bill 4447 prepared by non-partisan legislative staff described "the apparent problem" that the matching-address requirement of Rogers' Law "sometimes prevents lawfully registered voters from casting their ballots." Michigan House Fiscal Agency, Legislative Analysis of Bill to Allow Different Addresses For Driver's License and Voting, House Bills 4447 & 4448 at 1 (Jan. 14, 2008). Thus, "[i]n order to ensure that all registered voters find a lawful path to vote in every election, bills have been introduced to permit a resident address on a driver license (or personal

41

identification card) that is different than the voter registration address (on the Qualified Voter File)." *Id*.

100.   The Legislative Analysis also highlighted testimony offered by the Michigan Election Reform Alliance ("MERA") based on its members' research and experience, describing three ways in which Rogers' Law deterred and disenfranchised eligible voters.  MERA is a nonprofit, nonpartisan organization and is recognized as a tax-exempt 501(c)(3) public charity by the Internal Revenue Service. Its active members include election administrators and election observers.

101.   First, MERA cited "many examples of error in local clerks' offices, as voters seek to align their new driver's license addresses with changes in the Qualified Voter File." *Id*. In fact, MERA had recorded, "in one voting precinct alone, more than 30 cases where voters applied to vote from an address not listed in the precinct poll-book, some of which were the result of administrative error in the office of the city clerk when new changes of address were never, or erroneously, recorded." *Id*.

102.   Second, MERA described confusion and fears, whether accurate or not, that "voters in college towns who do successfully change the addresses on their driver's licenses and on the Qualified Voter File sometimes risk losing their family health care coverage, since they no longer live 'at home.'" *Id*.

103. And, finally, "voters in college towns who do not change their driver's license to reflect their changes of address are prevented from voting in elections back home by casting an absentee ballot, since Michigan law requires a first-time absent[ee] ballot voter to make application for the absent[ee] voter ballot in person, at the office of the hometown office clerk[, and f]or many university students there is little time . . . to travel home and apply." *Id.*

104. When HB 4447 was considered before the Committee on Ethics and Elections in 2008, there was a substantial amount of testimony regarding the negative impact that Rogers' Law had by that time clearly had on student voting and political participation by Michigan's youngest voters.

105. For example, Philip Shepard, a Professor Emeritus at Michigan State University and a member of MERA, testified in support of House Bill 4447, concluding that "[t]he current law creates an opportunity for administrative error that can easily lead to a voter being improperly disenfranchised." *H.B. 4447 and H.B. 4448: Hearing Before the Michigan House of Representatives Standing Committee on Ethics and Elections*, 94th Mich. Leg. 2 (May 15, 2007) (Testimony of Philip Shepard, Michigan Election Reform Alliance).

106. Professor Shepard described errors he personally observed as an Election Challenger in East Lansing in 2006, in which voters had changed either

their voter registration or driver's license address and yet the state had failed to properly record the change, leading to confusion at the polls. *Id.*

107.   Mr. Shepard noted these errors were "occasioned solely by the requirement in current law that the driver address match the voter address," and could "easily lead to a voter being improperly denied the right to vote," with a "much greater" effect expected on "voters who move frequently." *Id.*

108.   Nancy Bedell, a former Kent County Deputy Clerk and MERA member, noted she "spent more than half of [her] time educating people on the . . . intricacies of election law." *H.B. 4447 and H.B. 4448: Hearing Before the Michigan House of Representatives Standing Committee on Ethics and Elections*, 94th Mich. Leg. 1 (May 15, 2007) (Testimony of Nancy Bedell, Michigan Election Reform Alliance).

109.   In Bedell's experience, "Rogers' Law . . . seems to discourage voting especially for young people who change residences often" and "[y]oung people told me they had avoided registering on campus when they learned they had to change their driver's license address." *Id.*

110.   Bedell listed the barriers for college students to vote on campus, including that first-time voters who register by mail are not able to cast absentee ballots nor travel to their parents' address to vote, and students wish to maintain

their parents' address because they are covered by their parents' health or car insurance decline to register on campus. *Id.*

111.  Although some members of the Michigan Legislature were openly hostile to the idea of students voting in their college communities, *see* Barton, *supra* (describing how, in 2007, "State Rep. Tom Pearce (R-Kent County) asked . . . students about the possibility of student voters altering local politics in a district where they will likely only live for a few years"), House Bill 4447 nevertheless passed the Michigan House on July 25, 2007, with 58 votes in favor and 50 against. All Democratic Representatives supported the bill and all but one Republican Representatives opposed it. Mich. H. Journal, 94th Leg., Reg. Sess., 1118 (July 25, 2007).

112.  From there, House Bill 4447 was received in the Senate and was referred to the Senate Campaign and Election Oversight Committee, where it languished.

113.  In 2009, Representative Warren again introduced legislation, House Bill 4373, to repeal Rogers' Law. Similar appeals by non-partisan nonprofit organizations concerning the harms resulting from Rogers' Law were submitted to the Legislature for its consideration.

114.  The Director of Advocacy and Education at Ann Arbor's Center for Independent Living submitted a written statement regarding the effects Rogers'

Law has had on those with transient living conditions, particularly "students in Universities from 2-8 years." The organization described how Rogers' Law "has been a huge **barrier** for people who have multiple or no address(es) to be more civically engaged." Letter from Carolyn L. Grawi, Director of Advocacy and Education, to Michigan House of Representatives (Dec. 1, 2009) (emphasis in original). The 2009 repeal effort, however, failed.

115.   In 2012, Warren, by then a State Senator, attempted to introduce another repeal of Rogers' Law through an amendment to Senate Bill 823, a bill that sought to impose additional election restrictions on the procedure governing statewide ballot initiatives, among other new requirements. Despite unanimous Democratic support, the amendment failed, with 25 out of 26 Republican State Senators voting against it.

116.   In 2017, State Senators Warren, Steve Bieda, and Curtis Hertel introduced Senate Bill 506, a third piece of legislation to repeal Rogers' Law.[22]

---

[22] Like House Bill 4447 introduced by then-Representative Warren in 2007, Senate Bill 506 would have provided that "[n]otwithstanding any other provision of law to the contrary, an individual may change the residence address on his or her operator's or chauffer's license issued under the Michigan vehicle code . . . or official state personal identification card . . . , without changing his or her address for purposes of the qualified voter file or may change his or her address on the qualified voter file without changing the residence address on his or her operator's or chauffeur's license issued under the Michigan Vehicle Code . . . or official state personal identification card . . . ."

However, like earlier attempts, this one also failed, never making it out of committee.

117.   Many Republican Michigan legislators voiced hostility to the repeal effort, with Republican State Senator Dave Robertson, who previously voted against Senator Warren's 2012 amendment, arguing that, "[t]he logic behind [Rogers' Law] is very clear: [v]oters should have only one legal address for voting purposes." Patricia Lesko, *Who's Afraid of the Big Bad Vote? The Michigan GOP*, HUFFINGTON POST (Dec. 6, 2017), https://www.huffingtonpost.com/patricia-lesko/michigan-voting-legislation_b_1276999.html. The requirement that voters may only claim one residence for voting purposes, however, exists independent of Rogers' Law and carries with it the threat of imprisonment and hefty fines. *See* MICH. COMP. LAWS § 168.932a(d) (making it a felony punishable by imprisonment of up to four years or a fine of up to $2,000, or both, to, *inter alia*, "offer to vote or attempt to vote in a voting precinct in which the elector does not reside" or "offer to vote or attempt to vote more than once at the same election either in the same or in another voting precinct").

118.   Senate Bill 506 was referred to the Senate Elections and Government Reform Committee on July 12, 2017. The legislative session ended with no further action being taken.

## VIII.    Confusion Regarding Rogers' Law Continues Unabated

119.   It is now clear that, in the years since Rogers' Law was enacted, and directly as a result of that law, Michigan's young voters, and particularly, college students, have faced significant obstacles—including widespread confusion—to registering and voting in Michigan's elections. *See* Justin Jackson, *Did You Forget Something*, FERRIS STATE UNIVERSITY TORCH (Sept. 17, 2008), https://www.fsutorch.com/archives/archive/2008_09_17_opinions.html ("[T]hanks to Public Act 118 of 1999 (also known as 'Rogers Law'), registering away from home can lead to *a lot of confusion for many student voters*.") (emphasis added); ACLU of Michigan Fall Newsletter (Fall 2008), http://www.aclumich.org/sites/default/files/pdfs/2008fallnewsletter.pdf ("In past elections, the law has created *much confusion* for students across the state—including Michigan State University students in Mike Rogers' district.") (emphasis added); Philip Moon, *supra* ("Registering in East Lansing meant that [students] would have to change their permanent address on their driver's license, a hurdle of time and *confusion* that would help disenfranchise some.") (emphasis added).

120.   One of the common misconceptions stemming from Rogers' Law that has effectively suppressed student registration and voting is the belief, held by many Michigan college student voters, that if they change their driver's license

address, they risk losing their healthcare, which they often maintain through their parents at their parents' home addresses *See* Barton, *supra*.

121. The right to vote under Michigan law is plainly not linked to the address at which a person's health insurance is maintained, and if the Legislature were to pass such a law—essentially requiring its young people in many cases to choose between ensuring that they are able to afford medical care or exercising the right to vote—such a law would clearly be unconstitutional.

122. Yet, through Rogers' Law, the Legislature has effectively promoted the belief among young voters that they must make precisely such a choice. It is thus unsurprising that, since the enactment of Rogers' Law young voter registration and participation has fallen precipitously to among the lowest rates in the country.

123. Confusion stemming from such rumors has continued unabated to the present day, and incorrect or highly misleading statements by government and public university officials about Rogers' Law have exacerbated voter confusion.

124. For example, Michigan State University's official 2008 YouVote Guide stated that "[s]tate law requires that the driver's license record address match the one on your voter registration card in order to cast your ballot." It continued, in responding to the question that "My Roommate Told me That my Insurance Rates Could Change if I Make East Lansing my Voting Address. Is this

true?," that students are advised to "contact your insurance carrier prior to changing your address with the Secretary of State or City Clerk."

125.   That same year, the Michigan Student Assembly (of the University of Michigan) described Rogers' Law as "mandat[ing] that students vote in the district that is on their driver's license [which] *prevents many students from voting on campus*." Michigan Student Assembly, Regents' Report (Feb. 2008), http://www.regents.umich.edu/meetings/02-08/2008-2-II-8.pdf (emphasis added). The student government continued: "[a]nd so students cannot vote in the district that they live in and who's [*sic*] law they are subject to for more than 8 months of the year." *Id.*

126.   To date, Michigan election officials continue to foster misinformation about Rogers' Law.

127.   For example, the 2016 Davison Township's official Voting Tips for College Students, which as of the date of this filing still appears on the township's website, incorrectly states:

> There are several things to consider in making your decision regarding your principal residence:
> - Residency requirements for various colleges and universities follow rules set down by those institutions so be aware that your residence can determine how much tuition you will pay.
> - ***Health insurance may require that you reside with your parents if you are covered under their policy.***
> - Your residence may also determine automobile insurance rates.

*Voting   Tips   for   College   Students*,   Davison   Township   (2016),

http://www.davisontwp-mi.org/assets/voting_tips_college_students_2016.pdf

(emphasis added).

128.  The Richfield Township Voting Tips for College Students does the

same.

http://www.richfieldtwp.org/Portals/1094/docs/VOTING%20TIPS%20FOR%20C

OLLEGE%20STUDENTS.pdf (last accessed Aug. 7, 2018) (listing the above false

considerations for students' decisions regarding principal residence and warning

students that they must "identify your 'principal residence' in the state").

129.  These township voting tips stand in contrast to the information

published by the Undergraduate Student Government of Michigan Technological

University, which accurately describes the "lie[s] that prevent[] students from

voting," including that changing your driver's license address to reflect your

college address will impact "your dependency status, financial aid, or any

insurance policy." Mich. Technological Univ. Undergraduate Student Government,

Voter Registration Frequently Asked Questions, http://usg.mtu.edu/usg/votefaq

(last accessed Aug. 7, 2018).

130.  Upon information and belief, Defendants have taken *no* action to

counteract this rampant misinformation and ensure that student voters are property

informed of their right to vote in the communities in which they reside.

131. To the contrary, Defendant Secretary has been among those actively spreading false information tied to Rogers' Law, further confusing student voters as to their voting rights.

132. Most recently, in a March 2018 presentation to a group of students at Kappa Omega Alpha at Michigan State University, the Defendant Secretary told students living on or near the university that their school address is not really their home, and therefore, it would not be "fair" for students to register to vote at their campus address.

133. She went on to say that if students do choose to register to vote using their campus address, they must first obtain a completely new driver's license or state identification listing that campus address.

134. Though neither of those statements comport with Michigan law, they comport *entirely* with the misleading and disenfranchising intent and resulting impact of Rogers' Law.

135. On April 20, 2018, the undersigned counsel sent a letter to the Secretary, requesting that she confirm the correct understanding of Michigan law and institute a plan to resolve the widespread confusion around student voting and student voter registration in Michigan. The Secretary did not respond to counsel's request.

136. Confusion about exactly what Rogers' Law requires and how it interacts with the right to vote is so wide-spread that the press also repeatedly and regularly furthers the confusion, making it all the more likely that students are in fact choosing not to register because of the existence of the law.

137. Last year, for example, the Huffington Post reported: "if your license has your Detroit address, but you attend Michigan State University, you're still required by law to vote in Detroit," and noted "[s]ince the primary is on a Tuesday, it's safe to say most students won't be home to vote." Susan Demas, *Could Michigan's Restrictive Student Voter Law Hurt Bernie Sanders*, HUFFINGTON POST (Feb. 16, 2017), https://www.huffingtonpost.com/susan-j-demas/could-michigans-restrictive-student-voter-law-hurt-bernie-sanders_b_9237796.html.

138. The article's misstatement of Rogers' Law's requirements and operation is not the only reflection of widespread confusion regarding the law, as the article itself reports that "many MSU students in the district discovered they couldn't vote on campus" due to what was likely election officials' misapplication of Rogers' Law. *Id*.

## IX. Rogers' Law Continues to Burden and Abridge the Right to Vote of Young People, Especially College Students

139. The cloud of confusion resulting from Rogers' Law has led to the burdening and even outright denial of college students' right to vote over the last 18 years and will continue to do so, unless the requirement is enjoined. *See* Susan

Demas, *supra* ("[M]any MSU students in the district discovered they couldn't vote on campus."); Philip Moon, *supra* ("And the group [Mike Rogers] successfully disenfranchised was the young voters at Michigan State University, which is located in his district, and every other residential college and university in Michigan."); *see also* Patricia Lesko, *supra* ("[Rogers' Law] made it *harder for college students to vote*.") (emphasis added); Gumbrecht, *supra* ("[S]ome students. . . offer a cold stare to registration drive workers" due to Rogers' Law); *id.* (One student voter stated that "[i]t's just a messed-up bureaucracy," and "I realize now why so many people don't [vote]").

140.   As a result of Rogers' Law, there have been instances of college students being turned away from the polls as recently as in the 2016 election simply because the address on their driver's license did not match their voter registration address. *See* Zach Robertson, *Slices of life from East Lansing elections*, SPARTAN NEWSROOM (Nov. 8, 2016), http://news.jrn.msu.edu/2016/11/slices-of-life-from-east-lansing-elections/ (describing attempt by election official to prohibit a Michigan State University student from voting in East Lansing "because [her] driver's license ha[d her] home town as [her] address on it"); *see also Fix the System*, *supra* (stating that in the first election in which Rogers' Law was implemented, "many students were unaware of the law until they *were turned away* from the East Lansing polls on Election Day") (emphasis added).

141. Additionally, college students have been disenfranchised by administrative error stemming from Rogers' Law. As discussed above, a Michigan State University Professor testified to the Michigan Legislature that "[t]he current law creates an opportunity for administrative error that can easily lead to a voter being improperly disenfranchised." *H.B. 4447 and H.B. 4448: Hearing Before the Michigan House of Representatives Standing Committee on Ethics and Elections*, 94th Mich. Leg. 2 (May 15, 2007) (Testimony of Philip Shepard, Michigan Election Reform Alliance).

142. Confusion regarding Rogers' Law has deterred some students from registering to vote at all or from registering to vote in their college town. As discussed above, a Deputy Clerk testified that based on her experience, "Rogers' Law … seems to discourage voting especially for young people who change residences often," as "they had *avoided registering on campus* when they learned they had to change their driver's license address." *H.B. 4447 and H.B. 4448: Hearing Before the Michigan House of Representatives Standing Committee on Ethics and Elections*, 94th Mich. Leg. 1 (May 15, 2007) (Testimony of Nancy Bedell, Michigan Election Reform Alliance) (emphasis added). In particular, she "[p]oint[ed] to the complexity of [Rogers' Law]," which, in the end, "discourage[s] voting" and results in lower voter turnout among students. *Id.*

143.  Further, the significant civil *and criminal* penalties for noncompliance with the address reporting requirements associated with Rogers' Law also impose significant risk of intimidating and deterring college students from registering and/or voting at their campus address when confronted with uncertain or conflicting information about the law's requirements. Indeed, failure to report an address change or respond to a notice from the secretary could result in immediate suspension or revocation of one's driver license. MICH. COMP. LAWS § 257.315(3). And an individual who "knowingly report[s] a change of address to the secretary of state for himself or herself that is not his or her residence address" is a misdemeanor, "punishable by imprisonment for not more than 93 days or a fine of $1,000.00, or both." MICH. COMP. LAWS § 257.315(4). These stiff penalties relate to behavior—reporting address changes and responding to notices—that have nothing to do with eligibility for voting, but that could very well have a chilling effect leading to disenfranchisement, particularly given the widespread confusion over what is the appropriate residence address to list.

144.  Rogers' Law is particularly devastating to young voters because of unique characteristics that make them especially vulnerable to disenfranchisement as a result of restrictive or confusing elections laws. For example, young voters face steeper information costs and are less likely to know where to vote and how Michigan's voting process works in general. Further, because young voters are

more likely to be first time voters, they are more likely to be discouraged by barriers to entry. They are also less likely to be contacted by political campaigns or other political groups that could help educate them on the relevant voting process, because they are not on the lists generated from prior vote histories. Young voters are additionally more likely to receive information from unreliable sources, such as social media, regarding voting. Finally, young voters sometimes feel that their vote is not welcome, or they let their fear of making a voting mistake outweigh the benefits of voting. *See* Eric Plutzer, *Becoming a Habitual Voter: Inertia, Resources, and Growth in Young Adulthood*, 96 AM. POL. SCI. REV. 41, 41-56 (2002) (noting that voter turnout rates increase with age due, in part, to barriers to entry that lessen once voting becomes a habit and gains "inertia").

## X. The First-Time/In-Person Requirement Interacts with Rogers' Law to Further Burden and Abridge Young Peoples' Right to Vote

145.   Rogers' Law also interacts with other unnecessarily restrictive voting laws in Michigan, and particularly, the First-Time/In-Person Requirement to the marked and particular detriment of Michigan's youngest voters.

146.   The First-Time/In-Person Requirement mandates that "[a] person who registers to vote in a jurisdiction in this state by mail *shall vote in person* and shall provide identification if that person has not previously voted in person in this state." MICH. COMP. LAWS § 168.509t(2) (emphasis added).

147.   On its face, the current version of the First-Time/In-Person Requirement purports to be required by Section 303(b) of the Help America Vote Act of 2002 ("HAVA"), 42 U.C.S § 15483. *See* MICH. COMP. LAWS § 168.509t(2). As discussed below, this is not, in fact, the case.

148.   Nevertheless, Michigan's lawmakers affirmatively chose to put in place a strict, in-person voting requirement that in many cases imposes serious burdens on young voters, who are significantly more likely than the rest of the voting public to be first-time voters, while at the same time substantially *less* likely to have the information, transportation, or time to register in-person.

149.   As a result, these voters will be prohibited from voting absentee, even if they maintain their family's home address for voter registration purposes (as the Defendant Secretary apparently believes they should) and are unable to travel there to vote on Election Day.

150.   The First-Time/In-Person Requirement applies not only to those who register to vote by mail, but also to those who register through a non-governmental voter registration drive or by submitting their application to university officials.[23] Thus, first-time voters who register to vote by mail, or through a third-party voter registration drive—such as the type regularly conducted on campuses in order to

---

[23] *See* Mich. Bureau of Elecs., Election Officials' Manual at 8 (Jan. 2017), https://www.michigan.gov/documents/sos/II_Voter_Registration_265983_7.pdf at 7-8 ("The absentee voting restriction applies if the mail-in voter registration application form is delivered to the clerk's office by a third party.").

ensure that students, who are often becoming eligible to vote for the first time as a result of turning 18, are properly registered to vote—that then mails in or delivers the voters' registration application to election officials, are prohibited under Michigan law from requesting an absentee ballot for their first election.

151.   The First-Time/In-Person Requirement, moreover, expressly does *not* apply to registered voters who are 60 years of age or older, those who have "a disability as defined in section 103 of the persons with disabilities civil rights act, 1976 PA 220, MCL 37.1103," those entitled to vote absentee "under the uniformed and overseas citizens absentee voting act, or those "entitled to vote other than in person under any other federal law." MICH. COMP. LAWS § 168.509t(2)(a)-(c).

152.   For the many young, first-time voters who are understandably confused by the requirements and intimidating penalties associated with Rogers' Law, and who thus believe they cannot register to vote on campus but must instead use their family home address for voter registration purposes, the First-Time/In-Person Requirement's prohibition on absentee voting results in their complete disenfranchisement if—for a myriad of reasons beyond their control, including lack of access to reliable transportation and busy, inflexible schedules—they are unable to travel home to vote in-person on Election Day—a Tuesday in the middle of November, in the middle of the academic semester.

153.   Indeed, young voters in Michigan vote at very low rates—the difference between overall turnout and youth turnout is now larger in Michigan than in *any* other state. And young voters do not make up for their low rates of in-person voting by casting absentee ballots. Instead, as a consequence of Michigan's restrictive voting rules, and in particular, the First-Time/In-Person Requirement, absentee voting is infrequently used by young voters.

## XI.   The State Does Not Have Any Legitimate Interest, Much Less Compelling Interest, in Upholding Rogers' Law or the First-Time/In-Person Requirement

154.   The proponents of Rogers' Law have asserted three justifications for the statute: (1) it implements the NVRA; (2) it reduces complexity and expense for government offices by reducing two addresses to one address; and (3) it protects against voter fraud. However, all three of these alleged justifications are pretexts, and none are sufficient to justify the burdens on the fundamental right to vote imposed by law even under a rational basis standard, much less compelling interests that are narrowly tailored to address those interests.

155.   There is nothing in the NVRA that requires a voter's driver's license address to match her voter registration address. *See* NVRA, 107 Stat. 77, 79. To the contrary, the NVRA specifically allows an individual to maintain a driver's license address different from her voter registration address. *See id.* at § 5(d) ("Any change of address form . . . for purposes of a State motor vehicle driver's license

shall serve as notification of change of address for voter registration . . . *unless the registrant states on the form that the change of address is not for voter registration purposes*.") (emphasis added); *see also* Statement of Rep. Martinez, Mich. House of Representatives, June 2, 1999 Tr. at 40 (stating that the NVRA "did not determine that the Secretary would decide that there was only one address available to a person"). Indeed, many states do not have the same requirement.

156.   Further, the idea that Rogers' Law reduces complexity and expense for government offices by reducing the driver's license address and voter registration address to one address is simply not true. As was recognized by the Fiscal Implications of the House Legislative Analysis, drafted by nonpartisan Michigan House of Representatives staff, Rogers' Law in fact results in an "*increase*[] in administrative costs due to the additional requirements imposed." Senate Bill 306, Driver License/Voter Address, House Legislative Analysis Section (May 5, 1999) (emphasis added). Consistent with this, several local election administrators have publicly opposed Rogers' Law, both at the time it was being considered by the Legislature, and in the years since, on several grounds, including the added administrative burden.

157.   In addition, the argument that it is too administratively burdensome for elections officials to maintain two different address for one individual—an address for a driver's license and another address for a voter's registration form—

is undercut by the fact that even under Rogers' Law, elections administrators must still keep track of multiple addresses: (1) the driver's license/voter registration address, which must be the same; and (2) a mailing address, which may differ.

158.   Indeed, this very point was made when the Legislature was considering the law in 1999, by Representative Brater who pointed out, during the floor debate, that: "[t]he previous excuses that the Secretary of State has used - that you couldn't get an additional field in the [Qualified Voter File] software has been shown to be false by adding the ability to add a field for mailing address. So that cannot possibly be the reason." Statement of Rep. Brater, Mich. House of Representatives, June 2, 1999 Tr. at 23.

159.   Further, since Rogers' Law was enacted, new technology has been developed to make it even easier to allow a voter to maintain a driver's license address that is different from her address for voter registration purposes. *See* Patricia Lesko, *Who's Afraid of the Big Bad Vote? The Michigan GOP*, Huffington Post (Dec. 6, 2017), https://www.huffingtonpost.com/patricia-lesko/michigan-voting-legislation_b_1276999.html ("[T]here's now [new] technology to allow two addresses").

160.   Finally, preventing voter fraud does not justify Rogers' Law, as there was no evidence that any voter fraud problem existed when the law was passed. Representative Schauer, for example, stated that Rogers' Law "is veiled in the

motive of voter fraud," despite the fact that "there is no evidence of voter fraud. Statement of Rep. Schauer, Mich. House of Representatives, June 2, 1999 Tr. at 15. Representative Brater also stated: "[t]here is no evidence of fraud in the State of Michigan, so that cannot be the reason" for the legislation. Statement of Rep. Brater, Mich. House of Representatives, June 2, 1999 Tr. at 23; *see also* Statement of Rep. Dennis, Mich. House of Representatives, June 2, 1999 Tr. at 26 ("[T]his isn't about voter fraud."); Statement of Rep. Gieleghem, Mich. House of Representatives, June 2, 1999 Tr. at 13.

161.   Nor is there any evidence that voter fraud of any kind has become a legitimate problem in Michigan since the passage of Rogers' Law. *See* Mich. Bureau of Elecs. Rep. (2016) (concluding that an audit "found no evidence of pervasive voter fraud" in the state of Michigan).

162.   Further, the requirement that voters may claim only one residence for voting purposes exists independent of Rogers' Law and carries its own hefty penalties. *See* MICH. COMP. LAWS § 168.932a(d) (making it a felony punishable by imprisonment of up to four years or a fine of up to $2,000, or both, to, *inter alia*, "offer to vote or attempt to vote in a voting precinct in which the elector does not reside" or "offer to vote or attempt to vote more than once at the same election either in the same or in another voting precinct").

163.   Michigan's election laws also independently require that voters re-register to vote whenever they move to a new city or township and update their address if they move within a city or township. MICH. COMP. LAWS §§ 168.506; 168.507; 168.507a; 168.507b.

164.   The assertion that allowing voters to have a driver's license address that is different from a voter registration address in the Qualified Voter File makes fraud more likely is further undercut by Rogers' Law itself, which allows for two different addresses of an individual, a driver's license/voter registration address and a different mailing address, as discussed above.

165.   Further, as a practical matter, alerting the State to the two addresses, with which a Michigander associates for the purposes of a driver's license and voter registration, is, in fact, more transparent and provides the state with more complete information about its citizens.

166.   Similarly, the First-Time/In-Person Requirement is not in fact justified by the purported state interests that support it, including the claim that it is required to implement the NVRA, nor the later justification that it implements the Help America Voter Act ("HAVA"), nor any other state interest. *See* Michigan House Legislative Analysis of Motor/Voter Implementation, House Bill 5531, House Legislative Analysis Section (June 9, 1994), http://www.legislature.mi.gov/(S(1uzqsbttzhx2zx01d341eytf))/documents/1993-

1994/billanalysis/House/pdf/1993-HLA-5529-A.pdf (describing that House Bill 5531, along with others, "would, in part, incorporate into state voter registration laws provisions of the federal National Voter Registration Act of 1993"); *see also* MICH. COMP. LAWS § 168.509t(2) ("A person who registered to vote in a jurisdiction in this state by mail shall vote in person and shall provide identification as required under section 303(b) of the help America vote act of 2002 [*sic*]. . . if that person has not previously voted in person in this state."); Michigan Senate Journal, 2004 Reg. Sess. No. 39, Message to the Senate from Governor Granholm regarding her signing of S.B. 432 (describing the First-Time/In-Person Requirement as helping "in part to amend Michigan law to comply with federal mandates under [HAVA]").

167.   The NVRA does not, in fact, *require* states to mandate that voters can only vote in-person if they registered to vote by mail. *See* 52 U.S.C. § 20505(c).

168.   Similarly, the legislative history of the First-Time/In-Person Requirement belies the purported justification that it was required by HAVA. Multiple legislators voiced concerns that, not only was the Requirement *not* required by HAVA, but was also not in the spirit of HAVA, and that the portion of the law that became MICH. COMP. LAWS § 168.509t(2), specifically, would disproportionately and negatively impact young voters—particularly, college student voters.

169.   Though Governor Jennifer Granholm signed the bill that created the current requirement into law (which contained other provisions purportedly designed to bring Michigan into HAVA compliance not at issue here), she noted her reservations in a message to the Senate:

> Subject to limited exceptions, Senate Bill 432 would continue to require first-time voters registering to vote by mail to appear in person at the polls and present identification in order to vote, even when the identity of the voter was verified before the election. ***Continuing this requirement is especially burdensome for Michigan college students living away from home***. Section 303 of HAVA provides mechanisms to verify the identity of first-time voters prior to an election, avoiding the requirement that a first-time voter appear in person at the polls, and instead allowing the verified voter to cast an absentee ballot. ***Michigan law should be amended to take advantage of these alternative verification mechanisms afforded by HAVA to encourage greater voter participation while maintaining the integrity of the election process. Making it difficult for first-time voters to cast a ballot is not consistent with the spirit of HAVA.*** Michigan law should encourage first-time voters to participate in the electoral process, and should not impose unnecessary obstacles.

Michigan Senate Journal, 2004 Reg. Sess. No. 39, Governor's Remarks upon Signing SB 432 into Law (emphasis added); *see also* Michigan Senate Journal, 2004 Reg. Sess. No. 33 (State Senator Jacobs noted: "[t]his bill contains critical errors regarding first-time voters who are supposed to be allowed to register and vote by mail" and "simply does not help people vote, which is our most precious right, and I, therefore, urge its defeat.").

170. The Michigan Voter Registration Application provides further evidence that the alleged justification of implementing HAVA was pretext. It explicitly asserts that the federal voter registration by mail identification requirement is distinct from, and required in addition to, the First-Time/In-Person Requirement's requirements.[24]

171. The Voter Registration Application therefore requires that voters who register by mail provide either a copy of the various forms of primary or secondary identification as required by HAVA Section 303(b), or their Michigan-issued driver's license or state identification number, or the last four digits of their social security number, and that, despite having to provide this identifying information, the voter must nevertheless vote in-person in their first Michigan election, unless the voter is over 60 years old, disabled, or a UOCAVA voter. *Id.* This renders the in-person voting requirement of the First-Time/In-Person Requirement particularly bizarre, as it applies even if the voter has already verified his or her identification.

---

[24] *Compare* MICH. COMP. LAWS § 168.509t(2) ("A person who registered to vote in a jurisdiction in this state by mail shall vote in person and shall provide identification as required under section 303(b) of the help America vote act of 2002 [*sic*]. . . if that person has not previously voted in person in this state."), *with* State of Michigan, *State of Michigan Voter Registration Application* (Rev. 7-15), https://www.michigan.gov/documents/MIVoter Registration_97046_7.pdf ("Are you registering to vote in Michigan for the first time? If you have never voted in Michigan and choose to submit this form by mail, you must meet two requirements: a Michigan requirement and a federal requirement, as explained below.").

## CLAIMS FOR RELIEF

## COUNT I

**Denial or Abridgement of the Right to Vote on Account of Age
in Violation of the Twenty-Sixth Amendment, U.S. Const. Amend. XXVI;
42 U.S.C. § 1983; 28 U.S.C. § 2201; and 28 U.S.C. § 2202**

172.   Plaintiffs reallege and incorporate by reference all paragraphs set forth above as though fully set forth herein.

173.   The Twenty-Sixth Amendment to the U.S. Constitution provides in relevant part: "[t]he right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by . . . any State on account of age." (emphasis added).

174.   The goal of the Amendment "was not merely to empower voting by our youths but was affirmatively to encourage their voting, through the elimination of unnecessary burdens and barriers, so that their vigor and idealism could be brought within rather than remain outside lawfully constituted institutions." *Worden v. Mercer Cty. Bd. of Elections*, 294 A.2d 233, 243 (N.J. Sup. 1972).

175.   The Twenty-Sixth Amendment thus, by its plan text and history, guarantees qualified young voters a substantive right to participate equally with other qualified voters in the electoral process.

176.   Election laws, practices and procedures that have the purpose, at least in part, of denying or abridging the right to vote on account of age are

unconstitutional. *See League of Women Voters of Fla., Inc. v. Detzner*, 314 F. Supp. 3d 1205 (N.D. Fla. 2018) (holding interpretation of early voting statute to exclude only college campuses as early voting locations violated the Twenty-Sixth Amendment).

177.   Moreover, the Amendment (and its protections) has been recognized to have "particular relevance for the college youth who comprise approximately 50 per cent of all who were enfranchised by this amendment." *Walgren v. Howes*, 482 F.2d 95, 101 (1st Cir. 1973) (citing 117 Cong. Rec. 5817, 5825).

178.   In a Twenty-Sixth Amendment analysis, "[t]he impact of the official action—whether it 'bears more heavily on one [age-group] than another,' . . . may provide an important starting point." *Id.* (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). Further, "[s]ometimes a clear pattern, unexplainable on grounds other than [age] emerges from the effect of the state action even when the governing legislation appears neutral on its face." *Id*.

179. Rogers' Law is unexplainable on grounds other than age discrimination, and it targets Michigan's young voters to a significantly greater degree than the rest of Michigan's voting population.

180.   Further, as is reflected in its legislative history, Rogers' Law was enacted with the intent, at least in part, to suppress the vote of young voters in Michigan. As such, it violates the Twenty-Sixth Amendment.

181.   Injunctive and declaratory relief is needed to resolve this existing dispute, which presents an actual controversy between Defendants and Plaintiffs, who have adverse legal interests, because Rogers' Law subjects Plaintiffs to serious and concrete injuries to their fundamental right to vote, including, most immediately, in the upcoming general election to be held on November 6, 2018.

182.   Accordingly, Plaintiffs respectfully request that the Court: (i) declare that Rogers' Law violates the Twenty-Sixth Amendment to the United States Constitution; and (ii) preliminarily and permanently enjoin the Secretary and the Director of the Bureau of Elections, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from implementing, enforcing, or giving any effect to Rogers' Law.

## COUNT II

### Undue Burden on the Right to Vote in Violation of the First and Fourteenth Amendments, U.S. Const. Amends. I and XIV; 42 U.S.C. § 1983; 28 U.S.C. § 2201; and 28 U.S.C. § 2202

183.   The Plaintiffs reallege and incorporate by reference all paragraphs set forth above, as though fully set forth herein.

184.   Under the Equal Protection Clause of the Fourteenth Amendment and the First Amendment, a state cannot utilize election practices that unduly burden or abridge the right to vote.

185.   Absent relief from this Court, Plaintiffs and countless other young Michigan voters, including, in particular, college students who make up Plaintiffs' membership and core consistency, will be denied the opportunity to cast a ballot or will face significant burdens in doing so due as a direct result of Rogers' Law and the First-Time/In-Person Requirement and the confusion that they cause.

186.   The burdens imposed by Rogers' Law and the First-Time/In-Person Requirement, further, fall heaviest on Michigan's young voters, who are also more likely to be first time voters and to be interacting with, and learning how to navigate, the elections process. This fact already imposes significant barriers to entry for young voters seeking to vote, which Rogers' Law and the First-Time/In-Person requirement substantially exacerbates. *See* Eric Plutzer, *supra*.

187.   In addition, college student voters are more likely to constantly change addresses and to seek to maintain two addresses. Rogers' Law demonstrably discourages young people, in particular, from registering to vote and exercising their right to vote. And, under the First-Time/In-Person Requirement young, college-student voters registered at their family home and who are unable

to return there to vote in-person on Election Day will be disenfranchised altogether.

188.   In a case such as this, the Court must carefully balance the character and magnitude of injury to the First and Fourteenth Amendment rights that the plaintiffs seek to vindicate against the justifications put forward by the State for the burdens imposed by the challenged provision. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). "However slight th[e] burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) (quotation marks omitted).

189.   Rogers' Law and the First-Time/In-Person Requirement, through the burdens and confusion they impose, violate the right to vote of Plaintiffs, their membership and constituencies. *See Mich. State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656 (6th Cir. 2016) (finding plaintiffs' right to vote burdened because of voter confusion); *Bryanton v. Johnson*, 902 F. Supp. 2d 983, 995-996 (E.D. Mich. 2012) (recognizing that "likely confusion at the polls interferes with the right of all voters" to vote); *Coalition for Educ. v. Bd. of Elecs.*, 370 F. Supp. 42, 51 (S.D.N.Y. 1974) (recognizing that "confusion undoubtedly denied some [] voters the right to an effective vote"); *see also Guare v. State*, 167 N.H. 658, 665

(N.H. 2015) ("Because the challenged language [on the voter registration form] is confusing and inaccurate, and because, . . . it could cause an otherwise qualified voter not to register to vote in New Hampshire, we hold that, as a matter of law, the burden it imposes upon the fundamental right to vote [under the state constitution] is unreasonable."); *Canegata v. Schoenbaum*, 64 V.I. 252, 256 (V.I. Super. Ct. 2016) (recognizing that confusion "would undoubtedly interfere with the rights of the voters and cause them to be disenfranchised—the confusion will likely negatively impact the turn-out").

190.   These burdens are not outweighed by any legitimate, much less compelling, state interest in the law.

191.   Injunctive and declaratory relief are needed to resolve this existing dispute, which presents an actual controversy between the Secretary and Plaintiffs, who have adverse legal interests, because Rogers' Law and the First-Time/In-Person Requirement subject Plaintiffs and their members to serious, concrete, and irreparable injuries to their fundamental right to vote, including, most immediately, in the upcoming general elections to be held on November 6, 2018.

192.   Accordingly, Plaintiffs respectfully request that the Court: (i) declare that Rogers' Law and the First-Time/In-Person Requirement violate the First and Fourteenth Amendment to the United States Constitution; and (ii) preliminarily and permanently enjoin the Secretary and the Director of the Bureau of Elections,

their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from implementing, enforcing, or giving any effect to Rogers' Law or the First-Time/In-Person Requirement.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

a) declaring, under the authority granted to this Court by 28 U.S.C. § 2201, that Rogers' Law violates the Twenty-Sixth Amendment to the United States Constitution;

b) declaring under the authority granted to this Court by 28 U.S.C. § 2201 that Rogers' Law and the First-Time/In-Person Requirement violate the First and Fourteenth Amendments to the United States Constitution;

c) preliminarily and permanently enjoining the Secretary and the Director of the Bureau of Elections, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from implementing, enforcing, or giving any effect to Rogers' Law or the First-Time/In-Person Requirement under the authority granted to this Court by Federal Rule of Civil Procedure 65(a) and 28 U.S.C. § 2202;

d) awarding Plaintiffs their costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988 and other applicable laws; and

e) granting such other and further relief as the Court deems just and proper.

Dated this 30th day of August, 2018.

Respectfully submitted,

Marc E. Elias
Elisabeth C. Frost*
Jacki L. Anderson
PERKINS COIE LLP
700 Thirteenth St., N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-9959
melias@perkinscoie.com
efrost@perkinscoie.com
jackianderson@perkinscoie.com

Sambo Dul*
PERKINS COIE LLP
2901 N. Central Ave., Suite 2000
Phoenix, AZ 85012-
Telephone: (602) 351-8000
Facsimile: (602) 648-7000
sdul@perkinscoie.com

Mark Totten (Mich. Bar No. P70268)
MICHIGAN STATE UNIVERSITY
COLLEGE OF LAW**
648 N. Shaw Lane
East Lansing, MI 48824
Telephone: (517) 432-6935
mark.totten@law.msu.edu

*Counsel for the Plaintiffs*
*\*Applications for admission to be*
 *submitted or pending*
*\*\*Institutional affiliation provided for*
 *identification purposes only*